# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

UNITED STATES OF AMERICA     )
    upon the relation and         )
    for the use of               )
TENNESSEE VALLEY AUTHORITY,    )
                              )
      Plaintiff,            )
                              )
v.                          )     CASE NO. 3:08-cv-00901
                              )
AN EASEMENT AND RIGHT-OF-WAY   )     Judge Thomas A. Wiseman, Jr.
OVER A TOTAL OF 8.62 ACRES OF     )
LAND, MORE OR LESS, IN            )
RUTHERFORD COUNTY, TENNESSEE,   )
                              )
AND                       )
                              )
BARBARA HAKALA REAVIS, and    )
JOE E. REAVIS,               )
                              )
      Defendants.         )

## REPORT OF THE COMMISSION

This commission appointed pursuant to Administrative Order number 75 of this court and Rule 71A(h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

1.   The Notice and Amended Complaint in this cause, with property description, were filed September 22, 2008. The orders of possession, the investment orders and the orders of appointing commissioners were entered September 26, 2008. It was stipulated by the parties that the date of taking of this case was March 21, 2007.

2.   On February 25, 2010, the commission met with the parties, their counsel and expert witnesses for a view of the property at the Reavis tract.

3. The trial of this matter commenced on February 26, 2010 at the offices of Jones, Hawkins and Farmer in Nashville, Tennessee.

4. The take is in one section as it crosses the Reavis property comprising 8.62 acres, more or less, and also including guy wire rights. The easement is designated as HRMLR-17 comprising 8.62 acres +/- on the plan and profile map which is part of the Hartsville-Maury Transmission Line, Loop to Rutherford. Exhibit 1 which is the plan and profile map describes the underlying easement as well as provides a physical description of the power lines and topography of the land. It specifically lists the types of poles and structures which are on the easements described, including guy wire rights and the presence of guy wires. A full size copy of the plan and profile map is Exhibit 1. Also filed as a late exhibit supplement to the Plan and Profile Map was a generic engineering drawing of the structures and under structures and lines.

The following facts were stipulated:

A. The date of taking was September 22, 2008.

B. The acreage of the easement was 8.62 +/- acres.

C. The acreage of the subject is approximately 72 acres.

D. The width of the easement is 212.5 feet to either side of the centerline, total width is 425 feet.

E. The subject has 1,600 feet of road frontage on Coleman Hill Road.

F. Proposed experts are qualified to offer opinion testimony.

G. There are two lattice tower structures on the property that sit side by side.

2

H.  The right-of-way enters and exits the property at an angle. The centerline crosses approximately 803 feet of the property. The right-of-way runs along Coleman Hill Road for 516.37 feet.

I.  There is a triangular area of approximately .85 acres northeast of the right-of-way.

J.  There is a single-family residence on the property with a living area of approximately 3,413 square feet with an unfinished basement of approximately 1,200 feet. There is a detached three car garage which also contains a workshop. The landowners have lived on the property since 1974. The house is approximately 750 feet from the edge of the right-of-way.

K.  Each lattice tower structure is approximately 130 feet tall.

5.  Exhibits admitted at the hearing were as follows:

Exhibit 1   Plan and Profile Map;

Exhibit 2   Collective exhibit consisting of six pages of pictures of house and farm;

Exhibit 3   Collective exhibit of pictures of land before easement imposition;

Exhibit 4   Collective exhibit of pictures of land during construction and towers and lines;

Exhibit 5   Deposition testimony of Mrs. Reavis;

Exhibit 6   Interstate 65 proposed interchange state route 109…admitted for identification  ONLY;

Exhibit 7   Sumner County, TN Map No. 016 with parcel boundaries;

Exhibit 8   Sketch plat for Robert Freeman Property subdivision by Richard Graves;

Exhibit 9   Herb Pritchett appraisal report

Exhibit 10 Plaintiff's response to request for Admissions

3

Exhibit 11 Aerial photo of Freeman property showing power line area before construction

Exhibit 12 Landowner's opinion of value

Exhibit 13  Gene Carman appraisal report

Exhibit 14 Freeman subdivision plat with green drawing in

Exhibit 15 Collective exhibit with aerial photos and property parcel numbers

Exhibit 16  Howell letter

Exhibit 17 Norman Hall appraisal report

Exhibit 18 Freeman Compensation summary

Exhibit 19 Colored map of subject property area

Exhibit 20 Colored planning map of area

Exhibit 21 Gary Standifer appraisal review.

6. This case involved the acquisition of rights over an easement and right of way over 8.62 acres of land, more or less, in Rutherford County, Tennessee.  The total size of the tract from which the easement is taken is approximately 72 acres.  The parcel is seen in the maps and in the various expert reports.  The Commission walked over a large area of the parcel with the parties. The rights taken are more particularly described in the Declaration of Taking which is of record in this case as well as in the Plan and Profile Map, Exhibit 1.  The land taken and the easement is dedicated by the Tennessee Valley Authority as tract number HRMLR-17.  From the plan and profile map, Exhibit 1., the viewing by the commission, as well as a stipulation, the easement is  425 feet wide.  The commission noted that the easement crosses the property approximately northwest to southeast at the northeast corner of the property. C

4

onstruction of the power line was complete at the time of the hearing. The power line has 1,000,000 volts incoming and 640,000 volts outgoing for a total of approximately 1, 640,000 volts on the lines.

7. The land owner, Mrs. Barbara A. Reavis was called and testified. (T.R. p. 15.) She and her former husband bought the property in 1974. The house in which she presently lives was formerly situated closer to Coleman Hill Road and it was moved to its present location in 1978. Mrs. Reavis indicated that the house is connected to a septic tank system. (T.R. 20) She indicated that there were approximately sixty three acres left in the property after the imposition of the easement and that it was suitable for development but she did not have a present intent to develop it. (T.R. 21) Her opinion as a land owner was that the per acre value of the property on the unimproved land prior to the imposition of the easement was fifteen thousand ($15,000.00) dollars per acre. Her opinion was that the taking compromised the value of the property within the easement ninety percent and so the value of the take for the exact land covered by the easement was one hundred sixteen thousand three hundred seventy ($116,370.00) dollars. (T.R. 22-23) The total value of the entire acreage and the residence immediately prior to the imposition of the easement was one million one hundred forty five thousand ($1,145,000.00) dollars which included the value of the land. She valued the house itself at two hundred thousand ($200,000.00) dollars. Thus the value of the land without the house was nine hundred forty five thousand ($945,000.00) dollars. (T.R. 24-26) The value of the land was for the sixty three acres that was not under the easement, since the easement was already valued. (T.R. 25) In her opinion the remaining sixty three acres suffered incidental damage after the

5

acquisition of the easement of three hundred forty three thousand five hundred ($343,500.00) dollars which was a thirty percent value reduction of the remaining sixty three acres. That left a value for the remainder of eight hundred one thousand five hundred ($801,500.00) dollars. (T.R. 27-28) This three hundred forty three thousand five hundred ($343,500.00) dollar figure included the diminution value of the house. (T.R. 28) A rounded value of the damage to the exact land covered by the easement plus the incidental damage to the remainder was four hundred sixty thousand ($460,000.00) dollars rounded. (T.R. 29) Mrs. Reavis had a real estate license for approximately two years between 1987 to 1989. She did transact business as a licensed realtor before retiring her real estate license. (T.R. 30) The thirty percent remainder damage to the property resulted because she used to have a beautiful view and "it's just awful to sit on the front porch and look at all that now." Further, "well, especially in the afternoon, the sun shines on those wires and towers, and it's just blinding. It's just like sun shining on metal. It just flashes right in your face….we had a beautiful view." (T.R. 31). The property suffered visual impairment as a result of what took place by the imposition of the easement. (T.R. 36) Exhibit 4A shows a road across the property, "that's where they put a road across our property. They dug a road. Then they filled it with gravel and then when they got the towers finished, they went back and scraped all the gravel up. And it just left, like, a ditch through there." (T.R. 38-39) Mrs. Reavis further indicated that photos showed water in the road. (T.R. 39) . She said she never had a condition of water on the property before the tower construction. (T.R. 39). Nor were there any problems with pooling of water or water standing in the area before the acquisition by TVA. (*Ibid*) She did not have

6

water standing outside the area shown in Exhibit 4A. (T.R. 39) The photos are offered to show the ability of the property to drain before and after the project. (T.R. 40-41) Exhibit 4C was offered to show the ditches and pooling water are a condition that did not exist before the TVA easement. (T.R. 41) Mrs. Reavis described the condition of the ground where the easement was altered, saying "yes, because some of the dirt went with the gravel, and then they just came in and kind of smoothed it out. They didn't put more dirt back in there and that's one reason, too, water stands in there." (T.R. 46) It was her opinion that the property as it now exists is lower than before. (T.R. 46) She also indicated that she had had water accumulation in that area since the time of TVA's acquisition. (T.R. 46) Mr. Dickerson and Mr. Hall viewed the property in November of 2009 to do soil testing and evaluation. The taking was in September of 2008, fourteen months earlier. Thus Mrs. Reavis believes the testing was not representative of the quality of her soil immediately before the take. "(N)o, because the land in 2009 had already been disturbed, and soil samples should be taken before the land is disturbed." (T.R. 47)

8. TVA trucks went onto the land with different equipment and dug out the land. (T.R. 49). She observed the trucks sink in the land after they dug it out. A bulldozer was also used, and that is when "they all got stuck." (T.R. 49-50) She thought the digging by TVA caused the trucks to get stuck. (T.R. 50) The area within the easement was dry and her fifteen thousand ($15,000.00) dollar per acre price was based upon the claim that the property was dry land. (T.R. 61) It was dry enough to pull a trailer across it and dry enough to pull a house across it. (T.R. 61) Her claim of value of fifteen thousand ($15,000.00) dollars an acre was premised upon the claim that it was

7

dry enough that the area could be subdivided for home sites. (T.R. 62) Hay had been cut on the front field in the easement. (T.R. 64)

9.  Mrs. Reavis said the cutting of trees on the adjoining property on the hill impacted the water flow on her property. "(W)hen it would rain, water would run down that hill and run down into the field, and it never did that before they cut those trees." (T.R. 64) Her thirty percent damage figure to the area outside the easement was to the property as a whole, "the whole thing." (T.R. 66). She had public water on the property. (T.R. 66) The property was approximately twenty minutes from Murfreesboro. (T.R. 67) The construction lasted approximately one year and a half. (T.R. 67) During the thirty six years they have been living on the property they have grown milo and hay on the field. There is a creek that runs across the field from the front field where the hay was grown up to behind the pond. When it rained water would runoff the hill and down into the creek, across the property, under the driveway, and down to the Harpeth River. (T.R. 68-69) The first step taken by TVA was to dig a place for the gravel to be put on the easement as a temporary road for the equipment. (T.R. 73) There also was a culvert admittedly placed by the government (T.R. 77). The government also admitted its trucks caused the ruts on the property. (T.R. 78)

10. Russell Edwin Parish was called as an expert appraiser by the land owner. It was stipulated that he could testify as an expert appraiser and express opinions as to value. His appraisal report was admitted as Exhibit 6. The government objected to particular matters, unspecified, within the report and to the methodology which objection was overruled by the commission. (T.R. 82-83) The effective date of the

8

appraisal was September 26, 2008. (*Ibid*) He indicated that he determined the land value before the taking was twelve thousand ($12,000.00) dollars per acre totaling eight hundred forty one thousand two hundred twenty four ($841,224.00) dollars. (T.R. 84) There were improvements on the property. In his opinion the total depreciated value of the improvements was two hundred ten thousand seven hundred forty two ($210,742.00) dollars. (T.R. 84-85) Thus the total value of the land and improvements prior to the acquisition was one million fifty one thousand nine hundred sixty six ($1,051,960.00) dollars. He damaged the land covered by the 8.62 acre easement at ninety percent for a total damage of ninety three thousand ninety six ($93,096.00) dollars. (T.R. 85) He found a twenty five percent damage to the entire remainder. (T.R. 86) There was also an uneconomic remainder, a small triangle at the northeast corner, .85 acres. This he damaged at ninety percent. (T.R. 86-87) The total just compensation due the owner was three hundred thirty eight thousand seven hundred seventy two ($338,772.00) dollars which he rounded to three hundred thirty nine thousand ($339,000.00) dollars. (T.R. 88) The highest and best use was future residential development. (T.R. 88) There were no FEMA flood hazards or flood zones. (T.R. 89) The property was rolling with some level terrain and some steep areas. The property has sixteen hundred feet of road frontage. (T.R. 90-91). It has adequate road frontage for multiple types of single family development. He used the sales comparison approach as to the value of the land and the cost approach relative to the improvements which is the single family dwelling. (T.R. 91-92) The total value of the residence and the attached garage was two hundred ten thousand seven hundred forty two ($210,742.00) dollars. (T.R. 92)

11. He had four comparable sales. Comparable Sale #1 had topography similar to the subject. This property was one of the most relevant sales in his search. (T.R. 94) He made an adjustment for time of sale on all four of the comparable sales at three percent per year. In his opinion, the fair market value of the subject property was eight hundred forty one thousand two hundred twenty four ($841,224.00) dollars. Using the Marshall Swift cost handbook and applying depreciation to improvements he valued the improvements at two hundred ten thousand seven hundred forty two ($210,742.00) dollars. (T.R. 98) He opined that the remaining 60.78 acres and improvements were damaged at twenty five percent with the placement of the two power line structures and the lines on the property. He noted that five hundred thirteen feet of the available road frontage of sixteen hundred feet was affected by the easement and that "it's not the same as what it was and with that factor it has affected the remainder." (T.R. 101)

12. On cross-examination Mr. Parish was asked about a prior survey easement and he indicated that he had not assigned any damages for that. (T.R. 102-103). In his view, the easement for a driveway which goes to the property of the land owner's son at the rear of the property would not be a value burden on the property because in the event of redevelopment it could be moved. (T.R. 103-104) His evaluation of twelve thousand ($12,000.00) dollars per acre took into effect all of the easements that existed at the time of the date of take. (T.R. 105) He had not consulted Natural Resource Conservation Service maps for the subject property relative to soils. (T.R. 108) He checked FEMA flood maps. The property is not in a flood zone and does not require flood insurance. (T.R. 108-109) He did not look at soil types on the

10

properties. (T.R. 109) The portion of the tax map that he had blacked out from one of the comparable sales might have been an incorrect drawing. (T.R. 111) In response to a question about drainage problems he indicated that no drainage problems were noted before the construction began. He did not use properties or comparables where there was substantial value to improvements. (T.R. 124) He damaged the remainder of the property not within the easement at twenty five percent. (T.R. 128)

13. He had studied other instances where there were double lattice tower power lines going across property. (T.R. 130) His damage to the house was based on what it would sell for before and what it would sell for after the taking, not what was found in literature (T.R. 135) It was based only on his opinion and experience. (T.R. 136) He opined that "any buyer-anybody looking at this property clearly would not pay the same amount for the property." (T.R. 136). Mr. Parish stated the house in the Betty Maynard case already had in its view a pre-existing TVA power line easement. (T.R. 150-151) His report in the earlier case was filed as Exhibit 9. (T.R. 151)

14. Mr. Joe E. Reavis, one of the land owners was called to testify. When the power line was constructed TVA initially came in with trucks which got stuck. They then ran a gravel road down the center of the right of way. When they were through with construction TVA came in with backhoes and dug the gravel road out, taking with the road the topsoil leaving a trench eighteen inches to two feet deep. They then just smoothed it all in and as a result it has "left a low place through there." (T.R. 155-156) The present condition is lower than the pre-existing condition. (T.R. 156) He concurred with and had the same opinion as his wife, Mrs. Reavis with regard to the issue of value and the damages to the remainder of the property. (T.R. 157). There

was no problem with wetness. (*Ibid*) He had not noticed any flooding or water holding in that field. (T.R. 162)

15. There are two five hundred kilovolt lines on the two towers and a total of four one hundred sixty one kilovolt lines on the towers. The government agreed to provide electronic copies of the generic drawings of the towers and parts of the towers from which the lines were hung. (T.R. 163-164) Mr. Reavis' house is approximately fifty feet higher than the field in which the towers are located. (T.R. 164). The Commission noted during the viewing that there are total of thirty-four lines on the two towers.

16. Randy Dickerson was called to testify by the government. He was stipulated to be an expert soil scientist and also a fact witness. He indicated that he had spent the last twenty five years testing soils in Rutherford County. He indicated he had performed soils tests along Coleman Hill Road. He indicated that the NRCS information is available for interpretation for many different criteria including adequacy of areas for dwellings, adequacy and suitability for dwellings with basements or adequacy for septic tank absorption fields. (T.R. 167) Data for the NRCS maps was developed in the late 1960's or possibly as late as 1970 and 1971. It showed the condition of the property at least forty years ago.

17. He subsequently went on the property and studied the area up to about three hundred feet on either side of the easement. He made approximately twenty five observations by auguring inside and outside of the TVA easement. The locations of his augurings are shown on the map that is contained in the first part of the report. (T.R. 168-170) He said there was not really any difference in the disturbed areas and the undisturbed

12

areas based on his augurings. He said there was some difference in the AP Horizon which is the top six inches of the soil where TVA had done their work. (T.R. 170) He said that the soil was characterized as Egam soil material, bordering on Roellen. (T.R. 173) He said it is a poorly to somewhat poorly to well drained soil classes and typically exhibits seasonal wetness. He indicated it was wet when he went on it (T.R. 173) on November 25, 2009. He said the area below the upper horizon showed evidence of seasonal wetness, contained a quite heavy clay percentage and in some cases water would refill the hole before he could actually get the auger bored. (T.R. 175) There was evidence of long term saturation and wetness. With regard to long term saturation and wetness he said that the most prominent observed characteristic was "gleying" or the reduction of the mineral element of the soil. In his opinion the situation had been there for thousands of years as it developed over geologic time. (T.R. 177) This was consistent with the soils maps. (T.R. 177-178)

18. There were also biological indications of this situation and the most prevalent of these would be the presence of crawfish. (T.R. 178-179) This was shown by areas where they burrow down and immerse themselves in water. (*Ibid*) There were crawfish holes in the undisturbed areas. (T.R. 179) In his opinion this property would not be suitable for residential purposes. (T.R. 183). He is certified as a soil consultant to dictate where the soil is favorable for onsite waste water disposal systems. (T.R. 184). In his opinion there was no area within the right of way where State regulations would allow a conventional septic tank disposal system. (T.R. 186) A house pad could be built on the soil. He found the same characteristics inside the easement and outside the easement. (T.R. 190) The area is pretty much a basin. Water drains into it.

(T.R. 191) He had looked at soil maps of some of the sales used as comparables by Norman Hall. He did not know if there was a residence built on them. (T.R. 200)

19. His report and its definition does not say that Egam soils are fully drained rather that they are well drained or moderately well drained. (T.R. 202) He agreed that there was a more than normal rainfall during the period he went on the property. He had not looked at the drainage on the property prior to the cutting of trees on the hill on the adjacent property. (T.R. 204) The drainage on the woods on the adjacent property "has everything to do with" the drainage onto the Reavis property. (T.R. 205) He further indicated he picked three hundred feet out from the easement because that was what he was "instructed to do". (*Ibid*) Approximately seventy decentralized waste water treatment systems had been or were being built in Rutherford County. (T.R. 215) One was two miles from the subject property. (T.R. 216) The Tennessee Department of Environment and Conservation would not work with his soil testing because it could not be done unless the soils were undisturbed to a minimum of twenty four inches. (T.R. 222-223) Neither a soil evaluation nor a percolation test would be permissible in disturbed soils. (T.R. 224) He had sold five plus acres for over sixty thousand ($60,000.00) dollars that would have brought in about twelve thousand ($12,000.00) dollars per acre. (T.R. 230) He did a study or evaluation for a decentralized waste water system. (T.R. 231) The subject property could support a couple of septic systems under the right set of conditions. (T.R. 231) Mr. Dickerson thought the soils data and the NCRS maps were reliable. (T.R. 233-234) The recent construction would not have disturbed the soil below the depth of the TVA construction. (T.R. 236) The soils on the subject will not percolate, in his opinion.

14

(T.R. 236) Five acres of good soil would be required for a decentralized waste system on the property. (T.R. 237)

20. Norman Hall was called as an expert appraiser witness by the government. His qualifications as an expert and his ability to express an opinion as to value were stipulated. His report was entered into evidence as Exhibit 13. The property contained 72.4 acres. The effective date of his appraisal was September 22, 2008. He did not inspect the property until December 3, 2009 at which time the towers were already in place. (T.R. 250) According to Mr. Dickerson's report the front portion of the property was wet and it would be difficult to get in there during wet season. (T.R. 251) He saw the property as having three portions: the front which was basically level with road grade, rose slightly upward and was cleared; an area of mixed land, part wooded, part cleared; an area of woodland in the back. (T.R. 252) He considered trying to come up with an overall rate per acre but decided against that because the better property was along the road with the road frontage and so he split the land into the three different areas. He allocated 28 acres along the road which is the part where the TVA easement crossed. For that he allowed nine thousand five hundred ($9,500.00) dollars per acre. With the take being 8.62 acres he allowed ninety percent loss in value which equated to seventy three thousand seven hundred ($73,700.00) dollars as far as the value of the area where the easement was located. He also noted one acre triangular in shape. Because of the shape he allowed damages of fifty percent to that property which he rounded to five hundred ($500.00) dollars. (T.R. 252-253) The first tree line where the easement crosses there is about 3 ½ acres on the road. That was damaged fifty percent which or seventeen thousand

15

($17,000.00) dollars rounded. He found total incidental damages of twenty two thousand ($22,000.00) dollars. The value of the easement damages was seventy three thousand seven hundred ($73,700.00) dollars. The total amount due to property owner, in his opinon, is ninety five seven hundred ($95,700.00) dollars. (T.R. 253) There were no damages to the house because it was located seven hundred fifty feet from the easement and thus it did not suffer any loss in value. (T.R. 253) He damaged land on the road frontage that was under the TVA easement to the right. This was between the TVA easement and the driveway. (T.R. 255-256) He had only damaged a portion of it down to where the tree line picked up again. His theory behind that portion being damaged and not the rest of the land was that there was a tree row that would block the vision and you could put a home in the undamaged portion and it would not be seen. This portion was a good distance away from the right of way. (T.R. 256) Based on the literature available, in his opinion, it was not appropriate to damage property large distances away from power lines. (T.R. 263) However, the existence of two towers was unusual, likely causing some resistance to purchasing the property. But those were the only two areas that would suffer damage. (T.R. 265) The two areas he chose to damage were more visible and would suffer loss in value. (T.R. 266)

21. He considered the soils on the comparable sales to be comparable. (T.R. 266) TVA has staff appraisers look at the property in order to make the initial offer. (T.R. 269-270) He did not see the property in the before condition as to whether there was any pooling of water and thus has no independent information concerning that. (T.R. 270) Rutherford County was one of the fastest growing counties in the United States. (T.R.

16

271) The neighborhood would continue to see steady although slow residential growth in the coming years. He waited to finish his report until he got the Dickerson report on soils. (T.R. 275) Approximately 45 acres of the subject property had not had soil testing done on it by Mr. Dickerson. (T.R. 276) He was not familiar with the decentralized waste water systems in Rutherford County or the step systems. (T.R. 277) The difficulty of putting in a septic system and lines in that area as well as putting in a house because of instability of soils effected his valuation. (T.R. 280)

22. He indicated that he had looked at three different types of property being open land, wooded land and then mixed terrain land and that he found comparables for all three of those areas to justify his valuations. (T.R. 291) He does not often split property up in such a manner. USPAP prefers land be treated as a whole. (T.R. 292) A further reason for his unusual approach was that it was difficult to find comparables. (*Ibid*) His comparable sale 1 was the same as comparable sale 3 for Parish. (T.R. 293) Two of his comparable sales were also comparable sales from Mr. Parish. (T.R. 293) His comparable sale #1 contained 47 acres and indicated a value of eleven thousand nine hundred twenty two ($11,922.00) dollars an acre rounded to twelve thousand ($12,000.00) dollars. It was very close to the subject property. Both he and Mr. Parish considered it comparable. It did not have a public sewer. The soils were better than the soils on the Reavis property based on a conversation he had with Mr. Dickerson. Mr. Dickerson did not do auger testing on that property, but relied on the forty year old maps. (T.R. 295-296) He reduced the average value of the open land two thousand ($2,000.00) dollars per acre because of Mr. Dickerson's soils map. (T.R. 298) There were two main issues when he does appraisals. One was whether the soil

17

percolates and the other was whether the property was in the flood plain. (T.R. 300-301) The property was not in a flood plain. The soil may not percolate, and if it does not percolate then the highest and best use for the property is agricultural. (T.R. 301) His comparable sale #4 indicated a rounded value of fifteen thousand ($15,000.00) dollars per acre. This comparable was also used by Mr. Parish. It was the best indicator of value if the proper adjustments were made. (T.R. 303) The value of all the land together open, wooded and mixed was six hundred thousand ($600,000.00) dollars. (T.R. 308) The tree lined area was different. There was open land and "you do have those towers". (T.R. 311) The 3 ½ acres would be less valuable because of that. (T.R. 311) MR. Hall does not think a developer would clear cut the tree line which hides his undamaged portion from the view of the towers as he believes the developer would want that tree line as a buffer. (T.R. 313) Cutting it down would expose the view of the towers. (T.R. 314) He did not damage the house because it was seven hundred fifty feet from the edge of the right of way. (T.R. 314) He agreed in response to a question from the commission that whether the view affects value is a judgment call and there is no data to support it either way. (T.R. 317) He agreed that an appraiser was entitled to use their judgment when rendering an opinion as to whether a visual such as the one in this case has an impact or not. (T.R. 323)

23. Below is a table summarizing the opinions of the landowner and the appraisers. This summary is not the entirety of their opinions but lists the major relevant parts:

| Appraisers/ Landowner | Mrs. Reavis-Landowner | Parrish | Hall |
|---|---|---|---|
| Highest and best use | Development | Future res. Devel. | Low density Residential |

18

| Value per acre | 15,000/acre Improve/200,000 | 12,000/acre Improve/210,742 | Open/9,500/acre Wooded/7,000/acre Mixed/8,500/acre |
|---|---|---|---|
| Percent of damage | 90% ease. 30% remndr. | 90% easement 90% remnant 25% remndr. | 90%/easement 50%Traingle parcel 50%/irreg parcel |
| Damage to easement | 116,370 | 93,096 | 73,700 |
| Incidental damage | 343,500 | Remnt/8,251 Remndr/237,425 | 22,000 |
| Property as a whole | 460,000 rnd. | 338,772 | 95,700 |
| Amount due owner | 460,000 rnd. | 339,000 rounded | 95,700 |

24. The differences of opinion of the witnesses involved the underlying value of the property, whether to assess incidental damages and the extent of incidental damages. There was also a very significant disagreement with regard to the nature of the soil within the easement and its suitability for development and percolation. The underlying value of the property was within a range of $9,500 per acre to $15,000 per acre, with lesser values to other portions of the property. There were substantial differences as to the amount of incidental damage ranging from damage to two irregular and/or cutoff remainders in the amount of $22,000 to damaging the entire property in the amount of $343,500. Total damages varied from $95,700 to $460,000. The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex*

*rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the property is taken by condemnation. See, *United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979).

25. The TVA also filed a written brief in support of its Objections to the Damage Testimony of Russell Parrish centering primarily around his assessment of damage to the entire property outside the right of way including the residence. TVA objected to this testimony and report based on the *Instructions to Commissioners*, 61 F.R.D. 503, 507 and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 588-89 (1993). The landowner filed a Response in Opposition. The Commission notes that TVA's own expert, Mr. Hall, a former Chairman of the Tennessee Real Estate Appraisal Commission, stated that an appraiser was entitled to use his own opinion in a situation such as this where it was an issue of impact of view from or upon a house in a case such as this, and that he had not personally looked at every sale that might shed light on this situation. (See paragraph 17. above.) Generally a district court's decision to admit or not admit expert opinion and reports is reviewed on an abuse of discretion standard. See, *General Electric Co. v. Joiner*, 522 U.S. 136, 138, 118 S.Ct. 512, U.S.Ga. (1997). *General Electric v. Joiner* was a jury case. Where the factual bases of a study are so dissimilar to the facts of the case at issue it is not an abuse of discretion

20

for a trial court to reject the study. *General Electric, supra*, 522 U.S. at 144-145. "The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." See, *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 852 (6th Cir. 2004). TVA does not address whether the Commission is to be treated as a jury within the context of Daubert, et al. If so, the Court may wish to itself address the Daubert motion's efficacy in this proceeding. If the Commission is to be treated as an entity more akin to a magistrate, special master, or referee than a jury, as the Commission believes, then the Commission would not see the need to be protected from potentially confusing or misleading science, and be sufficiently competent to not need a "gatekeeper" function. Thus, the Commission DENIES the Motion to Exclude Mr. Parrish's opinions as to damages and notes that the Objection to parts of Mr. Parrish's testimony goes to the weight of his testimony and not its admissibility. This is especially true given Mr. Hall's own testimony that consideration of "view" was a matter of opinion and the stipulation by the Government that Mr. Parrish could offer an opinion as an expert appraiser. This Commission has heard these very experts testify many times and has read and re-read the various expert reports and studies. As a general proposition the Commission gives far less weight to studies than it does to the actual comparable sales analysis and particulars of the property in question. The Commission has seen many truly enormous and basically unhelpful studies over the course of its hearings. The Commission has yet to see one that is truly valid or reliable. As a general rule, and here, the Commission lets the impact of the studies go to the weight given to them, rather than serve as a basis for accepting or rejecting outright a given expert's

21

opinion. It is worth noting in this regard that both TVA's and the Landowner's experts found damage to the area outside the easement, they differed only as to its extent.

26. Further, the *Instructions to Commissioners*, under which this Commission operates, 61 F.R.D. 503, 506 (E.D. Tenn. 1973, Judge Taylor), have an extensive discussion about the assessment of credibility and the weighing of the evidence. As Judge Taylor noted there, "Expert or opinion testimony is only as good as the facts and assumptions upon which it is based and if such testimony is without any support in the demonstration and physical facts, it is worthless and may be disregarded.... In considering such testimony it is your duty to determine whether such opinion is correct or erroneous, and in arriving at your conclusion you should consider the manner and demeanor of the witness, the bias or lack of bias, the grounds upon which the witness based his opinion, his experience and knowledge of the matters about which he is testifying, particularly his knowledge of the property, along with other evidence in the case, and the reasonableness or unreasonableness of his opinion as viewed in the light of the knowledge and experience of the witness." The Commission sees no particular emphasis in the Instructions or Rule 71 on weighty consideration being given to studies that have questionable parameters and protocols.

27. It is worth noting that one appraiser, Mr. Parrish, damaged the entire property stating that it was his opinion based on his judgment that the house itself was damaged. This was consistent with the testimony of the landowner. It is also consistent with the pictures in Collective Exhibits 2., 3., and 4. In the before pictures, Collective Exhibit 3., there is only a clear view of hills from the front of the Reavis property. In

22

Collective Exhibit 4. there is a very obvious presence of the power lines and towers. The difficulty with this is the large distance from the easement to the house, at least seven hundred fifty feet. For this reason, i.e. the distance, the Commission deems the diminution of view from the house and the consequent assessment of damages to it by the landowner is unreasonable. The Commission deems it unreasonable to add another 2.5 percent to the damage to the easement area itself also. The damage is what it is and the overall damage to the area outside the easement cannot be double dipped or counted twice.

28. While the studies have been presented there was little testimony or proof about how the studies came to be done, what questions they were addressing and generally the "methodology and explanatory power of the statistical analysis...". *Taylor v. Proctor and Gamble Company*, 178 F. 3d 1296, (Table), 1999 WL 232695 (C.A. 6 (Ohio)) citing, *Simpson v. Midland-Ross Corp.*, 823 F. 2d 937, 944 (6th Cir. 1987). As the *Taylor v. Proctor and Gamble* court stated," Statisticians working from the same corpus of data often disagree at trial on the statistical significance of data - based on collection techniques, sampling methods, groupings, calculations used, control variables, etc." *Ibid.* Here the experts were clear that they did not control their variables. For a statistical study to "contribute anything of value" it is necessary that "the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." See *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1765 (1987) citing *McCleskey v. Zant*, 580 F. Supp. 338, 353-360 (N.D. Ga. 1984). Based on the various cross examinations this was especially troubling to the Commission since there was little, if any, clarity about

exactly what reality the database mirrored. Control of variables is important, particularly in this case and in land commission valuation cases generally, because what is being attempted to be done is the measurement of the influence of "potentially influential variables".

29. Here the variable(s) is/are the effect on property values and saleability of property caused by the placement of a powerline easement on property and the actual construction of powerlines. As Mr. Moore has noted in the statistical text he edited:

> "Correlation and regression describe the relationship between two variables. Often the relationship between the two variables is strongly influenced by other variables. We try to measure potentially influential variables. We can then use more advanced statistical methods to examine all of the relationships revealed by our data. Sometimes, however, the relationship between the variables is influenced by other variables that we did not measure or even think about. Variables lurking in the background, measured or not, often help to explain statistical associations.

> "A lurking variable is a variable that is not among the explanatory or response variables in a study and yet may influence the interpretation of relationships among those variables...A lurking variable can falsely suggest a strong relationship between X and Y, or it can hide a relationship that is really there...
> "Association is not causation. When we study the relationship between two variables, we often have to show that changes in the explanatory variable cause changes in the response variable. But a strong association between two variables is not enough to draw conclusions about cause and effect. Sometimes an observed association really does not reflect cause and effect.

> "An association between an explanatory variable X and a response variable Y, even if it is very strong, is not by itself good evidence that changes in X actually cause changes in Y.

> "The best way to get good evidence that X causes Y is to do an experiment in which we change X and keep lurking variables under control...When experiments cannot be done, finding the explanation for an observed association is often difficult and controversial. Many of the sharpest disputes in which statistics plays a role involve questions of causation that cannot be settled by experiment."

> See "The Practice of Business Statistics Using Data for decisions", Ed. By Moore,

> Mccabe, Duckworth and Alwan, New York: W.H. Freeman and Co., 2009.

24

30. The Commission is bound by Judge Taylor's admonition in the *Instructions*. The Commission must consider the grounds upon which the witness base thier opinion and if they do not exist may disregard it. As far as the so called "studies" go the Commission has considered them and finds them deficient because of their failure to control their variables. In the Commission's view none of the proffered studies adequately controlled variables. The Commission notes that no motions to exclude or objections were offered or filed and that all experts testified as such without objection, except as to an objection to Mr. Parrish's testimony while it occurred, even though TVA had his report when it stipulated he could express an opinion as to value. The Commission does not question their expertise, only the weight to be accorded such "studies".

31. In this case, the Commission believes the assessment of value issue has two parts, using the method allowed in the *Instructions* of assessing the damage to the land as a whole. The first of these is what is the underlying value of the property. The second is the amount of damage to the property as a whole. The landowners assessed value at $15,000 per acre for development property, plus the value of the improvements. Their appraiser assesses the underlying value at $12,000 per acre, plus the value of the improvements. The Government's appraiser assesses value at $7,000 to $9,500 per acre depending on location on the overall subject. He cites no value for improvements as he does not damage them.

32. The comparables used by the various appraisers are as follows. The comparables of William Parrish were: 1. Jones to Carlson on Coleman Hill Road, 15.44 acres sold July 7, 2007 for $12,953 per acre for a total price of $200,000; 2.Simpson to Nation

on 4107 Coleman Hill Road, 7.71 acres sold August 22, 2005 for $13,359 per acre for a total price of $103,000; 3. Brantley to Zago on Rehobeth Road, 46.97 acres sold May 23, 2008 for $11,922 per acre for a total price of $560,000; and 4. Frost to Summers on 4073 Hill Road sold October 11, 2007 for $10,787 per acre for a total price of $275,500. All were within one mile of the subject. The comparables of Norman Hall were: 1. Brantley to Zago on Rehobeth Road, 46.97 acres sold May 23, 2008 for $11,922 per acre for a total price of $560,000; 2. Walker to Levin on Patterson Road, 22.97 acres sold August 25, 2006 for $12,952 per acre for a total price of $297,500; 3. Tully to Ingram on Patton Road, 30 acres sold August 30, 2006 for $10,000 per acre for a total price of $300,000; 4. Jones to Carlson on Coleman Hill Road, 15.44 acres sold July 7, 2007 for $12,953 per acre for a total price of $200,000; 5. Ezell to Warner on Coleman Hill Road, 19.41 acres sold June 3, 2005 for $5,400 per acre for a total price of $104,814; 6. Hartman to Nation on Coleman Hill Road, 10.79 acres sold August 22, 2005 for $9,129 per acre for a total price of $98,500; 7. Schankler to Roberts on Coleman Hill Road, 8.67 acres sold September 7, 2007 for $7,786 per acre for a total price of $67,504; 8. Narramore to Mounivong on Coleman Hill Road, 7.5 acres sold March 2, 2007 for $6,933 per acre for a total price of $52,000; 9. Schlanker to Huss on Coleman Hill Road, 30.0 acres sold June 27, 2007 for $9,200 per acre for a total price of $276,000; 10. Wallace to Villanueva on Taliaferro Road, 28.79 acres sold September 17, 2008 for $6,322 per acre for a total price of $182,000; and 11. Wallace to Cannon on Taliaferro Road, 16.8 acres sold May 9, 2007 for $10,119 per acre for a total price of $170,000. Eight of the Hall sales were on Coleman Hill Road, one was just off Coleman Hill Road and two were on

Taliaferro Road. Three were within Williamson County, barely. The sales of Parrish were from $11,084 per acre to $14,595 per acre. The sales of Hall were from $5,400 per acre to $12,953 per acre. The appraisers appraised values as noted in the chart above. Two sales were used by both appraisers. They were: 1. Jones to Carlson on Coleman Hill Road, 15.44 acres sold July 7, 2007 for $12,953 per acre for a total price of $200,000; and 2. Brantley to Zago on Rehobeth Road, 46.97 acres sold May 23, 2008 for $11,922 per acre for a total price of $560,000. Given that these were relatively larger pieces of property, especially Brantley to Zago, and the subject was seventy-two acres, the Commission deems them the two most comparable sales.

33. The Commission credits the landowner's testimony as to the value of the house as it is consistent with the appraiser, however, even though Mrs. Reavis has been a real estate agent and has lived there over thirty years her value for the land of $15,000 per acre is rejected. The landowner's testimony as to land value was not consistent with the actual comparable sales data in the neighborhood which was substantial. As noted, however, the landowner and the landowner's expert appraiser were close together on the value of the improvements. They also both ascribed diminution of value outside the easement area as well as within the easement area.

34. The Commission was presented with a soils study by Randall Dickerson, (Exhibit 10.) The gist of Mr. Dickerson's study was that the soil within the easement and three hundred feet to either side of it was poorly drained. He indicated in his opinion there was no area within the right of way where State regulations would allow a conventional septic tank disposal system. (T.R. 186). His report, however, says, "Some small inclusions of series with better characteristics were viewed. These

27

inclusions may or may not support individual disposal systems until very thoroughly evaluated, mapped, and permit applied for with TDEC. It is unlikely that enough of these areas could be located to support more than 1 or 2 systems if at all." (Exhibit 10. Section D.) His report is not as categorical in its denial as his testimony. Balanced against this is the landowner of more than thirty years' testimony that the land was not prone to standing water, and that the pooling came about as a result of TVA disturbing and/or removing the soil. Mr. Dickerson further indicated that he had not looked at the drainage on the property prior to the woods on the hill on the adjacent property above the subject property being cut. (T.R. 204) He indicated that the drainage on the woods on the adjacent property "has everything to do with" the drainage onto the Reavis property. (T.R. 205). Given the landowner's testimony about absence of pooling, the clear representation of and altered area of soil within the easement portrayed in Exhibits 3. and 4., the concession by Mr. Dickerson that the drainage onto the soil had changed with the clearing of the adjacent hillside that drained onto the property, and the inconsistency between his report and his testimony regarding the possibility of building wastewater disposal systems on the property as well as Mr. Dickerson's inability to do percolation testing because the soil was disturbed the Commission credits the landowner's testimony as to the ability of the soil to drain before the imposition of the easement. This detracts from Mr. Dickerson's testimony's impact and as a result from Mr. Hall's assessment of value and damage because Mr. Hall's opinions as to value and damage are heavily dependent on Mr. Dickerson's conclusions. (See, Hall report, Exhibit 13. P. 34.)

35. As a result the Commission partially credits Mr. Parrish's testimony. With regard to the comparables, as noted above, there were two common comparable sales used by both appraisers. The Commission deems them the two most comparable sales. Based on these two jointly used comparables the Commission credits the value testimony of Mr. Parrish as to underlying land value of $12,000 per acre and the value of improvements. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *United States v. 68.94 Acres of Land,* 918 F.2d 389, 399 (3d Cir .1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). The court's authority under Fed.R.Civ.P. 71A(h) to exclude evidence of sales of dissimilar properties is affirmed with regularity. "The questions of whether [comparable sales] transactions are near enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court." *Baetjer,* 143 F.2d at 397. Since no two pieces of land are ever exactly alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities…There is no basis, however, to rely on patently remote transactions when more comparable sales are available. *Cf. United States v. 100 .80 Acres of Land,* 657 F.Supp. 269, 274 n. 7 (M.D.N.C.1987) ("The record supports that the [subject property] is unique in its location and relation to the market, and therefore,

29

that no comparable sales exist.")." See, *U.S. v. 10.082 Acres of Land*, No. CV05-00363-PHX-NVW, 2007 WL 962846, page 4 of 12, ( D. Ariz. 2007, Judge Wake). The Commission cannot credit Mr. Hall's method of splitting the Reavis property into three separate areas because as he admitted, he does not often split property up contra to USPAP's preferred methodology of treating the land as a whole. We have considered his rationale for doing so in that it was difficult to find comparables, but find that lacking as we do believe comparables, when adjusted, were available. His three areas are also less well defined than they should be, in our view, to be supportable in a condemnation proceeding. They are not mapped. When all of Gaul was divided into three parts, Caesar had a map. So because of the lack of crediting the soils scientist and Mr. Hall's method of creating three areas for value purposes which is inconsistent with USPAP and his normal practice the Commission cannot credit his valuation of that property at between $7,000 and $9,500 per acre.

36. Mr. Parrish applies the following land values and damages: First, exact land within the easement: 8.62 acres at $12,000 per acre damaged at 90 percent for damage of $93,096; second, triangle on northwest corner: .764 acres at $12,000 per acre damaged at 90 percent for damage of $8,251; third, remainder of 60.718 acres at $12,000 per acre damaged at 25 percent for damage of $184,740 (the Commission noted here that there appeared to be a computational error in this figure and it should have been $182,514, which is the figure the Commission will use going forward); and fourth improvements consisting of house and detached garage valued at $210,742 and damaged 25 percent for damage of $52,685; total damages being $338,772 rounded to $339,000. The size and scope of this power line, as observed at the view, as

documented by the photographs in evidence and as explained and described by the witnesses, is very significant. That significance is amplified by the fact that the easement crosses developable property along significant road frontage in a developing area in one of the fastest growing counties in the country.

37. The Commission cannot accept either the landowner's or Mr. Parrish's assessment of damage to the improvements. The towers and lines on the land are clearly visible from the house but it is seven hundred fifty feet away from the edge of the easement. The Commission cannot credit that damage to the house at that distance and in the circumstances presented by this case. The Commission credits the damage to the exact land covered by the easement, the triangle to the northwest and the remainder. This yields a total compensation due of $283,861.

38. The Commission credits the assessment of all appraisers that there is diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." See, *Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 520 [(6th] Cir. 1959). This analysis was affirmed *in United States ex rel. TVA v. Easement and Right-of-way*, 504 F.2d 305, 309 [(6th] Cir. 1968). It must be demonstrated that there is an actual profitable use or a market demand for the prospective use. See, *United States v. Easement and Right-of-Way 100 Feet Wide*, 447 F.2d 1317, 1319 [(6th] Cir. 1971). The Commission sees the Reavis property as developable property for the reasons stated above.

39. It is further clear from the testimony of the witnesses that the land had this potential, i.e. residential development, in the reasonably near future as of the date of taking. That potential may be used as a basis for a just compensation award. See, *U.S. ex rel. and for the use of TVA v. Hughes*, 251 F. Supp. 930 (E.D. Tenn 1966). The Commission also notes the subject property had all utilities available to it at the time of taking, either on site or very close by.

40. The Commission is then confronted with the issue of the amount of damages to the property. The Commission's award of loss of value, however, is to be for the fair and reasonable value of the property as a whole. See, *Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940) 503, at 507-508.

41. The Commission does agree that there is damage from the public apprehension of power lines as noted in *Hicks, supra*. Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. See, *U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966). See also, *Easement in Logan County, supra*. The landowner had the burden of proving the fair market value of the condemned land. *United States ex rel. and for Use of T.V.A. v. Powelson,319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, 1396-1397 (1943); United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969).*

42. The Commission is then confronted with the question of what damage is realistic. There is disagreement as to the amount and basis for incidental damages. The Commission has formed its own judgment, based on the testimony of the witnesses,

32

as to the loss occasioned by the take. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967).

43. The Commission partially credits Mr. Parrish's testimony as noted above.

44. Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their counsel, the Commission is of the opinion that the just compensation due the landowner is $283,861.00. For land valuation, we considered the witnesses' application of fair market value as of the date of taking, assuming a seller under no compulsion to sell and a buyer under no compulsion to buy, neither of whom is compelled to do so, and both of whom were in possession of all the known facts. As for damages, we considered the witnesses' use of the method of calculating damage to the exact area covered by the easement and adding any incidental damages to the remainder, as assigned by the *Instructions*. Thus the damage to the easement area itself we find to be $93,096. Incidental damages to the remainder portions of the property are $190,765. The total damages are $283,861. Hence the Commission respectfully reports that the just compensation due the landowner(s) is $283,861.00.

Respectfully submitted,

        /s/ William H. Farmer
**Chairman, TVA Land Commission**

        /s/ Jack Derryberry
**Commissioner**

        /s/ Horace Johns
**Commissioner**

33